UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SAMUEL JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-03141-JMS-TAB |
| | ) |
| WEXFORD OF INDIANA, LLC, | ) |
| PAUL TALBOT, | ) |
| MICHELLE LAFLOWER, | ) |
| CARRIE STEPHENS, | ) |
| CARRIE WELDER, | ) |
| | ) |
| Defendants. | ) |

**Order Denying Plaintiff's Motion for Summary Judgment,
Granting Defendants' Motion for Summary Judgment,
and Directing Entry of Final Judgment**

When a firefighter arrives at a burning house, she can't be blamed for failing to swiftly rescue the family cat from a nearby tree. Samuel Jackson's prison medical records reveal a multi-alarm fire: diabetes, hypertension, hyperlipidemia, morbid obesity, and osteoarthritis. These conditions don't excuse the prison medical team from also treating his toenail fungus, but they do demand a different perspective in judging whether the prison doctor properly exercised his medical judgment. Based on the undisputed facts properly before the Court, no reasonable juror could find that Mr. Jackson received constitutionally inadequate medical care for his fungal toenail infection, so the defendants are entitled to summary judgment.

### I.    Plaintiff's Motion to Supplement

Before turning to the parties' summary judgment motions, the Court addresses Mr. Jackson's motion to supplement his summary judgment pleadings. The motion to supplement

is unopposed, and Mr. Jackson filed the proposed supplement the same day as he filed a reply in support of his motion for summary judgment. The motion to supplement, dkt. [92], is **granted**.

## II.  Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its burden, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## III.  Application of Local Rule 56-1(e)

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573−74

(7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

Here, Mr. Jackson filed a "statement of material facts not in dispute" with his motion for summary judgment, dkt. 83, and a "statement of material facts in dispute" with his response to the defendants' motion, dkt. 89. But almost none of the asserted facts are properly supported by a specific citation. The Court will not dig through the record—including Mr. Jackson's more than 1400 pages of exhibits—to determine which of Mr. Jackson's assertions are supported by evidence and which are not. *See* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Instead, the Court considers only those assertions that are supported by proper citations to specific portions of the record. *See* S.D. Ind. L.R. 56-1(e).

### IV.    Undisputed Facts

#### A.    Mr. Jackson's Treatment

Mr. Jackson suffers from onychomycosis, a fungal toenail infection that causes discoloration and thickening of the toenails. Dkt. 79-1 at 1−2, ¶ 5 (Paul Talbot affidavit); dkt. 79-6 at 40 (medical records); dkt. 79-5 at 14, 50:24−51:2 (Jackson deposition). He also suffers from diabetes, hypertension, and hyperlipidemia, morbid obesity, leg pain, hip pain, and back pain. Dkt. 79-1 at 1, ¶ 4; dkt. 79-6 at 89−91. Mr. Jackson has had the fungal infection since 2000, but this case focuses on his treatment since 2017, when defendant Wexford of Indiana took over as the Indiana Department of Correction medical provider. *See* dkt. 8 at 2 (amended complaint). By that time, Mr. Jackson had already been diagnosed with onychomycosis, and medical staff sometimes trimmed his toenails for him. *See*, *e.g.*, dkt. 79-6 at 88. The individual defendants were

each employed by Wexford at some time between April 2017 and the present. Dkt. 79-1 at 1, ¶ 2 (Talbot); dkt. 79-2 at 1, ¶ 2 (LaFlower); dkt. 79-3 at 1, ¶ 2 (Stephens); dkt. 79-4 at 1, ¶ 2 (Welder).

Dr. Talbot and a non-defendant nurse practitioner treated Mr. Jackson for various illnesses between May 2017 and April 2018. Dkt. 79-6 at 69−85, 105−19. Dr. Talbot maintained Mr. Jackson's Tramadol prescription, which helped treat the pain from onychomycosis.

In late April 2018, Dr. Talbot treated Mr. Jackson for onychomycosis, among other things. *Id.* at 100−04. Dr. Talbott ordered that medical staff trim Mr. Jackson's toenails. *Id.* at 100. He also ordered a topical cream to treat a fungal infection on Mr. Jackson's left foot in the toe webbing. *Id.* at 100, 102. Dr. Talbot believed Mr. Jackson's toe web fungus was more serious than his toenail fungus.[1] He never observed cracked toenails or any other concern that would warrant surgical removal of the toenail. Dkt. 79-1 at 8−9, ¶ 36.

A nurse clipped Mr. Jackson's toenails in August 2018. Dkt. 79-6 at 98−99. From then until December 2018, a non-defendant nurse practitioner treated Mr. Jackson for various medical conditions, including foot pain due to diabetic neuropathy. *Id.* at 1−22. In December 2018, the nurse practitioner ordered a toenail trim. *Id.* at 1.

In May 2019, a non-defendant nurse overheard Mr. Jackson ask for his toenails to be clipped. She took him to the medical unit and clipped them. *Id.* at 130−31. Another nurse clipped his toenails again in July 2019. *Id.* at 124.

---

[1] Indeed, the toenail fungus may have been only the third or fourth most serious medical condition involving Mr. Jackson's feet. *See* dkt. 79-1 at 6, ¶ 24 (Dr. Talbot explaining that he was more concerned about "the potential of toe web fungus, given [Mr. Jackson's] poor leg circulation due to ongoing diabetes and obesity, which could make any infection more complicated."); dkt. 79-6 at 5 (nurse practitioner noting Mr. Jackson's report that his feet "throb[] constantly throughout the day" due to diabetic neuropathy); *id.* at 7 (nurse practitioner noting Mr. Jackson's "severely cracked heels" due to dry skin).

Also in July 2019, Mr. Jackson filed this action. Dkt. 1. Three months later, the Court entered a preliminary injunction directing the defendants to refer him to a dermatologist outside the prison. Dkt. 30.

A nurse practitioner treated Mr. Jackson again in October 2019. At this visit, Mr. Jackson had hardened, thickened toenails and dry, cracked heels. Dkt. 79-6 at 48. The nurse practitioner ordered another round of medical toenail clipping. *Id.*

Dr. Talbot treated Mr. Jackson on November 13 and November 20, 2019. He noted that Mr. Jackson's toe web fungus created a more serious risk than his toenail fungus. *Id.* at 50. Dr. Talbot prescribed a topical cream and twice-weekly foot soaks. *Id.* He declined to order an oral antifungal medication due to a risk of liver damage. *Id.* at 55.

The outside dermatologist treated Mr. Jackson on November 22, 2019. The dermatologist confirmed the prior diagnosis of onychomycosis and recommended an oral antifungal medication for 3 months. *Id.* at 40. Pursuant to this recommendation, Dr. Talbot ordered the oral antifungal medication despite his concerns about liver damage. *Id.* at 59. Dr. Talbot warned Mr. Jackson that he was already at risk for liver damage due to his hyperlipidemia and morbid obesity, and he ordered tracking of Mr. Jackson's liver enzymes. *Id.*

Dr. Talbot was transferred to another prison and has not treated Mr. Jackson since November 2019.

### B. Ms. LaFlower, Ms. Stephens, and Ms. Welder's Lack of Involvement

The careful reader may note that Ms. LaFlower, Ms. Stephens, and Ms. Welder are not mentioned in the discussion of Mr. Jackson's care. That's because Mr. Jackson points to no admissible evidence that they were involved. In his statement of disputed material facts, he contends that these defendants "all had supervisory responsibilities over their nursing staff" and

failed to ensure that proper care was given. Dkt. 89 at 4, ¶¶ 23−24. But he cites no evidence in support of this contention. In his statement of undisputed material facts, he asserts that they all "<u>knew</u> from [his] medical records that he was a diabetic and suffering in pain . . . for an extended period of time [with a] black toenail fungus infection." Dkt. 83 at 5. But the evidence he cites—Exhibits D, E, H, and K—does not support the assertion.[2] *See* dkt. 82-5 at 192−206 (Exhibit D) (medication records with no indication that they were reviewed by LaFlower, Stephens, or Welder); *id.* at 207−18 (Exhibit E) (grievance responses and emails, none involving LaFlower, Stephens, or Welder); dkt. 82-6 at 111−26 (Exhibit H) (job descriptions); *id.* at 236−41 (Exhibit K) (grievance responses not involving LaFlower, Stephens, or Welder).

### C.    Wexford's Policies and Practices

In his statement of disputed material facts, Mr. Jackson asserts that Wexford "maintained written policies that prioritized cost-savings over patient care." Dkt. 89 at 5−6, ¶¶ 29−30. In support, he cites a contract between Wexford and the Indiana Department of Correction. He does not cite a specific contractual provision, and no provision supports his assertion. *See generally* dkt. 82-6 at 130−46.

Mr. Jackson also asserts that Wexford has a practice of "improperly delegating its supervision of doctors to the doctors themselves, instead of overseeing them" as required by their contract with the Indiana Department of Correction. Dkt. 83 at 4. He cites the policies that

---

[2] In his deposition, defense counsel asked Mr. Jackson how LaFlower, Stephens, and Welder were involved in his care. Mr. Jackson's response was the same for each: "she worked for Wexford." Dkt. 79-5 at 10, 34:22−35:1 (Stephens); *id.* at 11, 41:6−14 (Welder); *id.* at 8, 26:16−21 ("I know [LaFlower] is with Wexford. . . . I know she's Wexford."). Aside from their employment with Wexford, Mr. Jackson offered no explanation for how any of these defendants knew about his toenail fungus, let alone that they were involved in treating it. Refusing to give straight answers to simple deposition questions is not wise strategy. In fact, it may open a party up to sanctions, including dismissal of the case. *See Donelson v. Hardy*, 931 F.3d 565, 567−70 (7th Cir. 2019) (per curiam) (affirming district court's dismissal of case as sanction for plaintiff's "obstructive behavior during his deposition").

Wexford's practice allegedly violates, *see generally* dkt. 82-6 at 127−214, but he points to no evidence of the alleged practice itself, dkt. 83 at 4.

## V.     The Defendants' Motion for Summary Judgment

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021); (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To survive summary judgment on his claims against any defendant, Mr. Jackson must put forth evidence that would allow a reasonable jury to find "(1) an objectively serious medical condition to which (2) [the defendant] was deliberately, that is subjectively, indifferent." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). For his claim against Wexford, he must point to evidence that Wexford policymakers exhibited deliberate indifference in the form of an express policy, a widespread custom, or a decision by someone with final decision-making authority. *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021).

Based on the facts properly before the Court, no reasonable jury could find that Mr. Jackson received constitutionally inadequate care. While there is some evidence that his toe fungus is an objectively serious medical condition, there is no evidence that would allow a jury to find that any defendant was deliberately indifferent to that condition.

### A.     Objectively Serious Injury

A reasonable jury could find that Mr. Jackson's toe fungus is objectively serious. A "medical condition is serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Perry*, 990 F.3d at 511 (cleaned up). Both Dr. Talbot and the outside dermatologist thought at least some treatment of the condition was appropriate, if not mandated, for Mr. Jackson's condition. Dkt. 79-1

at 8, ¶ 32 (Dr. Talbot noting that Mr. Jackson was provided with toenail trimmings and antifungal cream); dkt. 79-6 at 40−41 (dermatologist recommending oral antifungal medication). And Mr. Jackson testified that the condition causes him pain. Dkt. 79-5 at 14, 52:19−53:2; *see Thomas*, 991 F.3d at 771 (treatable prolonged pain is objectively serious medical condition). These facts are enough to survive summary judgment on this prong.

### B.   Subjective Indifference

No reasonable juror could find that any defendant was deliberately indifferent to Mr. Jackson's fungal toenail infection.

#### 1.   Dr. Talbot

A doctor's subjective indifference "is proven by demonstrating that [the defendant] knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* The Court does not consider treatment of one condition in isolation but instead evaluates "the totality of an inmate's medical care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

The "totality of care" lens provides proper focus in this case. Dr. Talbot could have prescribed oral antifungal medication earlier, but he declined to do so because Mr. Jackson was at risk for liver damage and the oral medication would have increased that risk. Instead, Dr. Talbot prescribed topical antifungal medication and directed medical staff to clip Mr. Jackson's toenails.

Mr. Jackson was also prescribed Tramadol for his hip pain, and he acknowledges that it helped his foot pain. Dkt. 79-5 at 15, 55:10−18.

The facts show that Dr. Talbot believed Mr. Jackson's toenail fungus was mainly a cosmetic condition, and he provided treatment accordingly. No reasonable jury could find that Dr. Talbot failed to exercise medical judgment, so he is entitled to summary judgment.

### 2. Ms. LaFlower, Ms. Stephens, and Ms. Welder

Ms. LaFlower, Ms. Stephens, and Ms. Welder's argument for summary judgment is simple: they had nothing to do with creating or implementing Mr. Jackson's treatment plan. Mr. Jackson argues that, as supervisors, they had an obligation to make sure the prison nurses took proper care of him. Dkt. 88 at 19 ("These Health Services Administrators failed Jackson in this sense because they were supposed to oversee nurses administering medication for his black toenail fungus infection, but instead of making certain that he'd received proper medication for his black toenail fungus infection, they just ignored him."). But in a 42 U.S.C. § 1983 action like this one, a "supervisor is . . . liable only if she was personally involved in the [alleged] constitutional violation." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). That means she had to "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [she] might see." *Id.* at 494.

Mr. Jackson points to no evidence that Ms. LaFlower, Ms. Stephens, or Ms. Welder facilitated, approved, condoned, or turned a blind eye to a constitutional violation. Most fundamentally, he points to no evidence that any of them knew he was receiving constitutionally inadequate treatment. To be sure, he asserts that they knew, but the evidence on which he relies does not support the assertion. Dkt. 83 at 5 (citing Exhibits D, E, H, and K); *see* dkt. 82-5 at 192−206 (Exhibit D) (medication records with no indication that they were reviewed by

LaFlower, Stephens, or Welder); *id.* at 207−18 (Exhibit E) (grievance responses and emails, none involving LaFlower, Stephens, or Welder); dkt. 82-6 at 111−26 (Exhibit H) (job descriptions); *id.* at 236−41 (Exhibit K) (grievance responses not involving LaFlower, Stephens, or Welder).

### C. Wexford

Mr. Jackson's arguments against Wexford are varied and disjointed—so the Court will clarify which arguments are relevant to this litigation.

To start, Mr. Jackson leans heavily on allegedly inadequate care he received for "over 19 years." Dkt. 88 at 2; *id.* at 6, 10, 11, and 13. But as he acknowledges in his complaint, Wexford has only been providing medical services to him since April 1, 2017. Dkt. 8 at 2, ¶ 4. Wexford is not liable for any unconstitutional medical care provided before that date.

Next, Mr. Jackson holds Wexford to the standard for individual liability, arguing that they "knew" of his medical condition and failed to treat it. Dkt. 88 at 9 ("Wexford . . . knew that providing a lack of medical treatment for Plaintiff black toenail fungus for 19 years place Plaintiff at risk of amputation or could be life threatening."[3]); dkt. 89 at 1, ¶ 4 ("Wexford . . . has been deliberate indifferent to Plaintiff's serious medical needs for multiple years and has denied effective pain medication."). As explained above, Wexford can only be held liable for an Eighth Amendment violation based on an unconstitutional (1) policy, (2) widespread custom, or (3) decision by someone with final decision-making authority. *Thomas*, 991 F.3d at 773.

Finally, the Court addresses Mr. Jackson's assertions of Wexford policies, practices, and customs. Once again, it is the lack of evidence that undermines his cliams. He makes bold claims about Wexford's practices. *See, e.g.*, dkt. 89 at 2, ¶ 12 ("Wexford . . . has systemic and deficient delivery of medical care by hiring Dr. Paul Talbot for the sole purpose of directing him to control

---

[3] Mr. Jackson points to no evidence that his condition threatened either life or limb.

cost by delaying serious conditions needing treatment and pain medication."); dkt. 83 at 3 ("Wexford . . . and their doctors just did not care . . . whether Plaintiff's black fungal infected toes or feet were amputated."); *id.* at 4 ("Wexford . . . and their doctors are not capable of providing Plaintiff onsite treatment for his black fungal infected toenails. Wexford . . . and their doctors have widespread bad practices that continue to place Plaintiff's health in constant jeopardy all aimed at saving money."). But he cites no evidence that supports these claims. Instead, he offers 29 pages of news stories and blurbs about Wexford (or a related company) from across the country, dating back to at least 2003. Dkt. 92-1 at 2−30. These stories show that some prisoners have successfully sued Wexford, that Wexford has been involved in labor struggles, and that some states have added and dropped Wexford as a medical provider. But they don't show that Wexford has a policy or systemic practice of ignoring inmate health in favor of cutting costs—or any of the other policies or practices Mr. Jackson alleges.

Because Mr. Jackson points to no evidence that would allow a reasonable jury to find that a Wexford policy, practice, or custom caused him to be denied constitutionally adequate healthcare for his toenail fungus, Wexford is entitled to summary judgment.

## VI.   Mr. Jackson's Motion for Summary Judgment

The defendants are entitled to summary judgment on all claims. Mr. Jackson's motion for summary judgment, dkt. [81], is therefore **denied**.

## VII. Conclusion

Mr. Jackson's motion to supplement, dkt. [92], is **granted**. His motion for summary judgment, dkt. [81], is **denied**. The defendants' motion for summary judgment, dkt. [77], is **granted**. Final judgment in accordance with this Order and the Court's August 7, 2019, screening order, dkt. [12], shall now enter.

**IT IS SO ORDERED.**

Date: 9/13/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

SAMUEL JACKSON
913731
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com